[Civ. No. 47185. First Dist., Div. Two. May 20, 1980.]

HARRY PARIANI et al., Plaintiffs,
Cross-defendants and Appellants, v.
THE STATE OF CALIFORNIA, Defendant,
Cross-complainant and Respondent;
JAMES OTTOBONI et al., Cross-complainants and Appellants.

**COUNSEL**

Duane W. Dresser, Ronald B. Friedman, Cotton, Seligman & Ray, Edward G. Chandler, Athearn, Chandler & Hoffman, Vernon W. Humber, Xenophon Tragoutsis, Kirt F. Zeigler, Robert Disharoon, Barbara Detrich Linn and Spridgen, Barrett, Achor, Luckhardt, Anderson & James for Plaintiffs Cross-defendants and Appellants and for Cross-complainants and Appellants.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Dennis M. Eagan, Deputy Attorney General, for Defendant, Cross-complainant and Respondent.

## OPINION

**TAYLOR, P. J.**—In this quiet title and declaratory relief action, Pariani, Ottoboni and Emerson, three groups of landowners, appeal from an adverse judgment decreeing that the mineral rights reservations in the patents reserved to the State of California (State)[1] the geothermal resources underlying the patented lands located in Sonoma and Lake Counties, commonly known as The Geysers. The owners contend that: 1) the geothermal resources were not expressly reserved by the patents or the applicable statues; 2) the court erred in concluding that the geothermal resources were "mineral deposits," and "mineral water." For the reasons set forth below, we affirm.

All of the landowners claim title from certain patents issued between 1949 and 1956 by the State. The Geysers property was conveyed for its full appraised value of $5 an acre. Each patent contained the reservation set forth below.[2]

Radioactive decay of minerals occurring deep within the earth's crust is the ultimate source of the heat in the geothermal resource system at The Geysers. The heat of the system creates a body of molten minerals known as magma. Weaknesses in the earth's crust in the vicinity of The Geysers, caused by the juncture of the earth's Pacific and North

---

[1] Only the landowners and the State are parties to this appeal.

[2] "...*reserving to the State* of California all oil, gas, oil shale, coal, phosphate, sodium, gold, silver, *and all other mineral deposits contained in said lands* (excepting all uranium, thorium or any other material which is or may be determined to be peculiarly essential to the production of fissionable materials, whether or not of commercial value), and further reserving to the State of California, and persons authorized by the State, the right to drill for and extract such deposits of oil and gas, or gas, and to prospect for, mine, and remove such deposits of other minerals from said lands (excepting all uranium, thorium or any other material which is or may be determined to be peculiarly essential to the production of fissionable materials, whether or not of commercial value), and to occupy and use so much of the surface of said lands as may be required therefor, upon compliance with the conditions and subject to the provisions and limitations of Chapter 5, Part I, Division 6 of the Public Resources Code...." (Italics added.)

American plates, have allowed the magma to make its way over millions of years from deep within the crust to an unusually shallow depth.

As it intruded, the magma heated the rock above it and also caused metamorphism in the rock, changing its mineralogy. The heated rock in turn heated the water within the rock formation and set up a hydrothermal convection system. The hydrothermal fluid contained minerals from the intruding magma and also minerals dissolved from the surrounding rock.

The heated water, as it circulated, deposited into fractures in the rock the minerals which it contained. Over long periods of time, these mineral deposits caused a seal to develop which became tighter and tighter with time, until a virtually impermeable barrier was formed around the geothermal fluid. There is some natural recharge by ground waters from outside the system, which is not a significant amount.

Pressure within the system caused the continued escape of fluid to the surface through fissures, so that, over time, natural discharge from the system exceeded natural recharge, resulting in a vapor-dominated system of dry steam. Evolution of The Geysers field into a dry-steam system occurred over 10,000 years ago.

There is approximately 90 times more heat contained in the rock than in the steam in the reservoir. The steam in the reservoir is composed of nonhydrocarbon gases, predominantly gaseous $H_2O$, and is at a temperature of approximately 475 degrees Fahrenheit and a pressure of approximately 500 pounds per square inch. Pressures within the steam reservoir exist independent of hydrostatic pressures, indicating that the steam reservoir is substantially cut off from the ground water overlying the system.

Below the steam reservoir is an area of boiling brine with a high concentration of dissolved minerals—silica, boron and arsenic among them. This boiling brine feeds new steam into the system.

The deposit of minerals in hydrothermal systems often creates, over long periods of time, veins of minerals in the fissures radiating outward from the heat source. The hydrothermal system at The Geysers has deposited veins of mercury, or quicksilver, which has been mined commercially.

The Geysers' geothermal reservoir system extends under the owners' property. It is manifested at the surface in the form of hot springs and steam vents, or fumaroles, located along Big Sulphur Creek in the vicinity of The Geysers Resort on property not involved here. There are no hot springs, steam vents, or fumaroles on the property that is the subject of this action.

Beginning in the latter part of the 19th century, the hot springs and steam vents along Big Sulphur Creek at The Geysers were used for thera- peutic and medicinal purposes. Certain springs were used for therapeutic bathing and the steam from the fumaroles was piped to a nearby resort hotel for use in "vapor baths" by the guests. Waters from these springs were also bottled and sold as "mineral water."

The first drilling for steam from The Geysers reservoir for the large- scale generation of electrical power began in the late 1950's along Big Sulphur Creek in the immediate vicinity of The Geysers Resort. The first large-scale generation of electrical power commenced in 1960. Additional steam wells were subsequently drilled on the subject property, some as deep as 10,000 feet, with the earliest power generation using steam from these latter wells commencing in 1972. There are approximately 90 pro- ducing wells throughout The Geysers area, which extract steam for the generation of electricity at the rate of 8 to 9 million pounds per hour.

Dry steam is transmitted from the reservoir to the surface through the well bores, and then through pipes to the five power plants on the subject property, where the pressure of the steam striking turbine blades provides the mechanical energy which operates the electrical generators. Because the heat energy of the steam dissipates rapidly, the steam must be used where it is discovered and cannot be transported as in the case of oil, nat- ural gas, coal or other minerals.

None of the minerals in the steam is found in commercial quantities. For purposes of abating the hydrogen sulfide which escapes to the atmo- sphere in cooling, it has been proposed to install a process to extract free sulfur at a cost of approximately $900 to produce sulfur worth $40.

After passing through the turbine, the steam is condensed and the hot condensate passed through cooling towers, where approximately 80 per- cent of the condensate evaporates into the air and 20 percent remains in liquid form. The minerals arsenic, boron, and ammonia are present in the

steam and its condensate in such amounts as to necessitate injection of the condensate into the ground through reinjection wells to avoid detrimental impact on the surrounding area.

Approximately 2 million pounds of condensate per hour is reinjected into the ground, some of which is reheated and converted into steam by the heat contained in the underlying rock formation and which reappears as steam at the wellheads, thus possibly prolonging the life of the geothermal reservoir. The Geysers' geothermal system is being depleted by the extraction of steam and with or without reinjection the steam will eventually be exhausted.

The area overlying the geothermal reservoir, including the subject property, is a remote, sandy, rocky, and steep mountainous area. The wells, gathering lines, and power plants have not significantly affected the beneficial use of the land surface.

■ The term "mineral water" has no precise scientific or legal definition. It is a vernacular term which includes water or steam valued for medicinal or therapeutic uses because of its chemical composition or its heat content. Some mineral water is ingested, while other mineral water is used for bathing only.

The subsurface steam produced for the generation of electrical power at The Geysers and the hot springs and steam appearing at the surface are part of the same interconnected geothermal system. The surface hot springs and steam and the subsurface steam are mineral waters.

The Geysers' geothermal resource system is a compound subsurface mineral deposit which in its historical development and at the present time involves the interaction and deposition of numerous minerals. As with other mineral resources, such as oil, oil shale, natural gas, and coal, this geothermal resource system is valuable as a source of heat for the production of electrical energy. This amalgam of minerals is not simply heat, or energy, or water. The fluid component of the resource, including the steam, is distinctly separate and different from, and is in fact not the "water" which is the subject of California water law.

■ The court then concluded that: 1) the geothermal steam was reserved to the State as "mineral waters"; 2) the geothermal resource system beneath the subject property, including the geothermal steam, is a "mineral deposit," and was, therefore, reserved to the State by its patent

reservations; 3) each of the patents reserved to the State did not convey to the patentees all geothermal resources lying in, on, or under the portions of the subject property respectively described therein, together with all rights to explore for, prospect for, drill for, extract, mine, and remove these geothermal resources and to occupy so much of the surface of the land as reasonably may be required.

At the time the patents were issued, the applicable statutes read, so far as pertinent, as set forth below.[3]

The parties agree that at the time the patents were issued, neither the State nor the patentees had any knowledge of geothermal resources underlying the patented lands. No thought was given to the potential development of electricity through the use of the then undiscovered geothermal resources and there was no specific intention by either the patentees or the State as to the geothermal resources. Thus, reservation to the State in the patents, quoted at footnote 2, page 926 above, did not refer to the geothermal resources but reserved to the State "all other mineral deposits," consistent with former Public Resources Code section 6401.

---

[3]Former Public Resources Code section 6401: "All oil, gas, oil shale, coal, phosphate, sodium, gold, silver, *and all other mineral deposits* in public lands belonging to the State, or which may become the property of the State, *are reserved to the State.* Such deposits are reserved from sale except upon a rental and royalty basis and except as otherwise provided by law. A purchaser of any public lands belonging to the State, or which may become the property of the State, shall acquire no right, title, or interest in or to such deposits. *The right of such purchaser shall be subject to the reservation* of all oil, gas, oil shale, coal, phosphate, sodium, gold, silver, *and all other mineral deposits,* and to the conditions and limitations prescribed by law providing for the State and persons authorized by it to prospect for, mine, and remove such deposits, and to occupy and use so much of the surface of the land as may be required for all purposes reasonably extending to the mining and removal of such deposits therefrom. The provisions of this section shall not apply to any compromise agreement entered into under this division" (italics added). (Stats. 1947, ch. 227, § 1, p. 796.)

Former Public Resources Code section 6403: "This section is enacted *for the purpose of declaring the scope and extent of* the powers, duties, purposes, responsibilities and jurisdiction of the State Lands Commission and *the legislative intent with respect to reservation of mineral deposits reserved to the State (Section 6401)*; but nothing herein shall be construed as limiting any power, duty, purpose, responsibility or jurisdiction heretofore or by this code vested in or conferred upon the commission.

"*Mineral deposits reserved to the State shall include all mineral deposits* in lands belonging to or which may become the property of the State, *including but not limited to* oil, gas, oil shale, coal, phosphate, alumina, silica, fossils of all geological ages, sodium, gold, silver, metals and their compounds, alkali, alkali earth, sand, clay, gravel, salts *and mineral waters*" (italics added). (Stats. 1947, ch. 887, § 6, p. 2084.)

The instant controversy focuses on the meaning of "all other mineral deposits." The owners urge that since the geothermal resources were not expressly excepted (Civ. Code, § 1084), their predecessors received a fee simple (Civ. Code, § 1105), including "the right to the surface and to everything permanently situated beneath or above it" (Civ. Code, § 829). ■ General mineral reservations should be construed by considering what the government intended to grant to the patentee, rather than whether it intended to reserve ownership of a specific resource. The purpose of a patent with a mineral reservation is to grant only a limited estate to the patentee.

In construing the general reservation of the patents, we do not write upon a clean slate. Recently, in *Geothermal Kinetics, Inc.* v. *Union Oil Co.* (1977) 75 Cal.App.3d 56, 58 [141 Cal.Rptr. 879], this court (Div. Three) held that a 1951 grant of "all minerals in, on or under" certain property, also situated at The Geysers, transferred the underlying geothermal resources to the owner of the mineral estate. In doing so, Justice Scott, in language equally apt here, said at pages 60 and 61: "In the construction of a grant or reservation of an interest in real property, a court seeks to determine the intent of the parties, giving effect to a particular intent over a general intent. (Civ. Code, §§ 1066, 1636; Code Civ. Proc., § 1859.) In the present case, the 1951 grant of mineral rights makes no specific mention of geothermal resources; hence, the general intent of the parties must be ascertained. In the absence of an expressed specific intent, several courts have sought to determine the general intent of the parties in construing the word 'mineral' in a deed, rather than resort to attempts at rigid definition. [Citations.]

"Initially, we observe that 'as a general rule a grant or reservation of all minerals includes all minerals found on the premises whether or not known to exist.' (*Renshaw* v. *Happy Valley Water Co.* (1952) 114 Cal. App.2d 521, 526 [250 P.2d 612].) Thus, the fact that the presence of geothermal resources may not have been known to one or both parties to the 1951 conveyance is of no consequence."

Justice Scott then concluded, at page 62, that the parties had a general intent to convey the geothermal resources. ■ The same rule of construction applies to the language of the patents here in issue, namely, that the general intent of the reservation controls when there is no specific intent with regard to a particular substance (see, e.g., Kuntz, *The Law Relating to Oil and Gas in Wyoming* (1949) 3 Wyo. L.J. 107).

The United States Supreme Court has on many occasions announced a rule of construction of federal grants in favor of the government, stating that: "[G]rants for the sovereign should receive a strict construction—a construction which shall support the claim of the government rather than that of the individual. Nothing passes by implication, and unless the language of the grant be clear and explicit as to the property conveyed, that construction will be adopted which favors the sovereign rather than the grantee" (*Northern Pacific Railway* v. *Soderberg* (1903) 188 U.S. 526, 534 [47 L.Ed. 575, 583, 23 S.Ct. 365]). (Cf. *United States* v. *Union Oil Co. of California* (9th Cir. 1977) 549 F.2d 1271 [40 A.L.R.Fed. 799], construing a mineral reservation of "all the coal and other minerals" in federal patents under the Stock Raising Homestead Act of 1916, to include the geothermal resources underneath the patented land, also located at The Geysers.)

█ Further, any doubt concerning the scope of the State's reservation must be resolved in favor of the State. Civil Code section 1069 provides: "A grant is to be interpreted in favor of the grantee, *except that a reservation in any grant, and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor*" (italics added).

Here, as in *Geothermal Kinetics, supra*, 75 Cal.App.3d 56, we focus upon the general intent by considering the purpose of the grant or reservation *in terms of the manner of enjoyment of the respective interests involved*. "The manner of enjoyment of the mineral estate is through extraction of valuable substances, and the enjoyment of the surface is through retention of such substances as are necessary for the use of the surface.... [¶] Applying this intention, the severance should be construed to sever from the surface all substances presently valuable in themselves, apart from the soil, whether their presence is known or not, and all substances which become valuable through development of the arts and sciences, and that nothing presently or prospectively valuable as extracted substances would be intended to be excluded from the mineral estate" (Kuntz, *supra*, 3 Wyo. L.J., pp. 112-113).

In *Acker* v. *Guinn* (Tex. 1971) 464 S.W.2d 348, 352, the court adopted this approach and held that iron ore was not included in a grant of "oil, gas, and other minerals," inasmuch as surface mining of iron ore would destroy the surface. In *Bambauer* v. *Menjoulet* (1963) 214 Cal.App.2d 871 [29 Cal.Rptr. 874, 95 A.L.R.2d 839], cited by the owners, the court held that since the removal of gravel would have de-

stroyed the surface, it was not a mineral within the mineral reservation (pp. 872-873).

Here, as in *Geothermal Kinetics, supra*, 75 Cal.App.3d 56, the court below specifically found that the geothermal wells, gathering lines, and power plants have not significantly affected the beneficial use of the land surface. This is one of the significant factors that has long led courts to hold that geothermal resources belong to the owner of the mineral estate (see Maxwell, *The Meaning of "Minerals"—The Relationship of Interpretation and Surface Burden* (1976) 8 Texas Tech. L.Rev. 255-289).

The owners here attempt to distinguish *Geothermal Kinetics, supra*, because of the specific substances enumerated in former Public Resources Code sections 6401 and 6403. The history of the statutes does not support their contention. Rather, the enumerations were nonexclusive and repeatedly amended for purposes of clarification.

As originally adopted, former section 6401 (Stats. 1921, ch. 303, § 1, p. 404) reserved to the State, so far as pertinent: "All coal, oil, oil shale, gas, phosphate, sodium, and other mineral deposits. . . ." In 1938, former section 6401 was amended to clarify that the reservation also included "gold, silver and *all other mineral deposits*" (Ex. Sess. 1938, ch. 5, § 31, p. 25; italics added).

In 1947, former section 6403 was added to read as quoted above, at footnote 3, page 930, and then in 1959, renumbered 6407 (Stats. 1959, ch. 615, § 1, p. 2601). In 1975, after the commencement of this action, section 6407 was amended to its present form, set forth below, so far as pertinent,[4] and geothermal resources included in the list of reserved minerals (Stats. 1975, ch. 316, § 2, pp. 761-762).

Later amendments, of course, cannot affect earlier deeds *unless* the original provision is sufficiently ambiguous and the later amendments are merely declaratory of the original grant. We think all of the above described amendments are merely declaratory of the original scope of the reservation. The general purpose of a later expression of legislative

---

[4] "*Mineral deposits reserved to the state shall include all mineral deposits* in lands belonging to, or which may become, the property of the state, *including but not limited to*, oil and gas, other gases including, but not limited to, nonhydrocarbon and geothermal gases, oil shale, coal, phosphate, alumina, silica, fossils of all geological ages, sodium, gold, silver, metals and their compounds, alkali, alkali earth, sand, clay, gravel, salts and mineral waters, uranium, trona, and *geothermal resources*." (Italics added.)

intent with respect to the previously enacted but ambiguous statute may be used in determining the meaning of the earlier patents (see, e.g., *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 590 [128 Cal.Rptr. 427, 546 P.2d 1371]; *California Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210 [187 P.2d 702]; *Learner Co.* v. *County of Alameda* (1965) 234 Cal.App.2d 278, 285 [44 Cal.Rptr. 535]). ■ Therefore, we hold that the purpose of the 1975 amendment, like the previous amendments, was to clarify rather than to change the legislative intent of Public Resources Code sections 6401 and 6407 as to the scope of the earlier reservation of "all other mineral deposits," as used in former section 6401, and "all mineral deposits" as used in section 6407.

The owners further contend that the trial court erred in finding that a geothermal system is a "mineral" or a "mineral deposit." The owners argue that a universal requirement of a mineral is that it must be a substance with a definite chemical composition. They rely on *Bambauer* v. *Manjoulet, supra,* 214 Cal.App.2d 871 (in which such an expert definition was accepted) and further contend that the geothermal resources at The Geysers lacks the essential attributes of a mineral, as they have neither "substance" nor "definite chemical composition," and consist merely of "heat."

■ "Mineral" is a word of general language, and not per se a term of art. It is not capable of a definition of universal application, but is susceptible to limitation or expansion according to the intention with which it is used in the particular statute (*Charlestone Stone Products Co., Inc.* v. *Andrus* (9th Cir. 1977) 553 F.2d 1209; *Bumpus* v. *United States* (10th Cir. 1963) 325 F.2d 264).

In *United States* v. *Union Oil Company of California* (N.D.Cal. 1973) 369 F.Supp. 1289, the court stated that the word "mineral" is used in many senses and does not have definite meaning; in its broadest sense, it encompasses that vast realm of everything other than animal or vegetable; but the word is necessarily subject to interpretation by reason of its context and particular usage. The term "mineral" includes a substance of mineral character broadly defined which is commercially valuable when extracted from the land, but excludes ordinary materials commonly associated with surface use (see 49 Cal.L.Rev. 763, 766-767 (1961)).

Many of the resources included within the term "mineral deposits" by section 6407 of the Public Resources Code have no definite chemical

composition. This court in *Geothermal Kinetics, supra*, 75 Cal.App.3d at page 61, specifically rejected the narrow, technical definition of the term "mineral," here urged by the owners. As we indicated at footnote 2, pages 61 and 62, the placement of the first California legislation for the regulation of geothermal resources leads to an inference that the Legislature viewed geothermal resources as mineral.

Here, as indicated above, the court specifically found that: "The Geysers geothermal resource system is a compound subsurface mineral deposit which in its historical development and at the present time involves the interaction and deposition of numerous minerals. As with other mineral resources such as oil, oil shale, natural gas, and coal, this geothermal resource system is valuable as a source of heat for the production of electrical energy. *This amalgam of minerals is not simply heat, or energy, or water*" (italics added).

The State's definition of "geothermal resources" does not limit such resources to "the natural heat of the earth" but includes "all *minerals* in solution or other products obtained from naturally heated fluids, brines, associated gases, and steam, in whatever form...." (Pub. Resources Code, § 6903; italics added.)

We note that the owners' attempted characterization of geothermal resources as "heat" was rejected by the tax court as "a mere play on words" when it argued that heat, not gas, was being produced at The Geysers (*Reich* v. *C.I.R.* (1969) 52 T. C. 700, affd. (9th Cir. 1972) 454 F.2d 1157).

Alternatively, the owners focus on one of the components of the complex Geysers geothermal system, the steam, and characterize it as "water," and then argue that since "water" is not a mineral, it is not within the State's reservation.

The liquid condensate of the geothermal steam is not the life-sustaining "water" which the courts have felt impelled to exclude from mineral grants and reservations. The court below found that "[t]he fluid component of the resource, including the steam, is *distinctly separate and different from, and is in fact not the 'water' which is the subject of the California water law*" (italics added). As this court observed in *Geothermal Kinetics, supra*, 75 Cal.App.3d, page 63, in rejecting the same argument: "Not only is there a sound geologic basis for distinguishing between the usual ground water system and geothermal

waters, but the rationale for recognizing the rights of the surface estate to these ground waters is largely inapplicable to geothermal waters. (See Bjorge, *The Development of Geothermal Resources and the 1970 Geothermal Steam Act—Law in Search of Definition* (1974) 46 Colo. L.Rev. 1, 22-23; *United States* v. *Union Oil Co. of California, supra,* 549 F.2d at p. 1280, fn. 21; Olpin, *The Law of Geothermal Resources* (1968) 14 Rocky Mt. Min. L.Inst., 123, 140-141.)"

Furthermore, as the court below further found, "[t]he subsurface steam being produced for the generation of electrical power at The Geysers...and steam appearing at the surface are part of the same interconnected geothermal system," and both are "mineral waters." This court in *Geothermal Kinetics, supra,* 75 Cal.App.3d 56, also pointed out that the liquid in the geothermal system was a separate, depletable deposit, cut off from the normal ground water system (p. 63). Justice Scott concluded that where courts have treated "water" as part of the surface estate, and not the mineral estate, they have done so on the basis that water is necessary to the enjoyment of the surface; and that since the condensate of the geothermal steam is actually toxic, making it unfit for surface use, there is no basis under the functional approach for treating "geothermal water" as part of the surface estate (pp. 63-64). Thus, the water and steam components of geothermal resources are part of a distinct water system (see *Reich* v. *C.I.R., supra,* 52 T. C. 700).

The owners also argue that in order for a resource not specifically named in a grant or reservation of minerals to be deemed included, it must have been recognized as a "mineral" in the vernacular of the mining world at the time of the reservation. This argument is merely another manifestation of the "specific intent" approach to the interpretation of mineral grants and reservations which we have rejected. Further, as the court indicated in *United States* v. *Union Oil Co. of California, supra,* 549 F.2d 1271, footnote 5, at pages 1273-1274, this is a minority view.

■ Newly discovered subsurface resources which were either unknown or not known to be valuable at the time of a grant or reservation are nonetheless comprehended within the term "minerals" (*Renshaw* v. *Happy Valley Water Co., supra,* 114 Cal.App.2d, at p. 526; see also, *United States* v. *Union Oil Co. of California, supra,* 549 F.2d, at p. 1273; *New Mexico and Arizona Land Company* v. *Elkins* (D.N.Mex. 1956) 137 F.Supp. 767, 771, app. dism. 239 F.2d 645 (uranium); *Cain*

v. *Neumann* (Tex.Civ.App. 1958) 316 S.W.2d 915, 922 (1918 lease; uranium); *Maynard* v. *McHenry* (1938) 271 Ky. 642 [113 S.W.2d 13, 14] (1871 deed; natural gas); *Waugh* v. *Thompson Land & Coal Co.* (1927) 103 W.Va. 567 [137 S.E. 895, 897] (oil and gas); see Annot. (1954) 37 A.L.R.2d 1440, 1441).

Geothermal resources share much in common with other subsurface resources such as oil, natural gas and coal. All of these sources of energy are mined principally for their heat content. Each of these resources takes a very long time to form. Each is finite and depletable. None is produced in a "pure" form, each being produced along with many of the same associated minerals. It is the mineral industry which explores and extracts geothermal resources, using the techniques of mining. ▆ We conclude, therefore, that the trial court properly concluded that the geothermal resources were "mineral deposits" and "mineral water."

In sum, we note that either under a constructional approach of the general intent reservation discussed above, or the classification approach used by the trial court, geothermal resources are reserved to the patenting government.

In view of the above, it is not necessary to discuss the other contentions on appeal.

The judgment is affirmed.

Rouse, J., and Smith, J., concurred.

The petition of plaintiffs and appellants for a hearing by the Supreme Court was denied July 17, 1980.