[No. D057774. Fourth Dist., Div. One. Sept. 30, 2011.]

SUKUT CONSTRUCTION, INC., Plaintiff and Appellant, v.
RIMROCK CA LLC et al., Defendants and Respondents.

818

## COUNSEL

Gill & Baldwin, Kirk Stewart MacDonald and Stanley Haren for Plaintiff and Appellant.

Gatzke Dillon & Ballance, Mark J. Dillon, Stephen F. Tee and Michael P. Masterson for Defendant and Respondent Rimrock CA LLC.

Allen Matkins Leck Gamble Mallory & Natsis, Stephen R. Thames and Robert C. Shaia for Defendant and Respondent Otay Valley Quarry LLC.

**OPINION**

**O'ROURKE, J.**—Sukut Construction, Inc. (Sukut), appeals from a summary adjudication of its cause of action for foreclosure of a mechanic's lien. The court ruled in favor of Otay Valley Quarry LLC (Otay) and Rimrock CA LLC (Rimrock), the owner and operator, respectively, of Otay Valley Quarry (Quarry), located in Chula Vista, California. Sukut contends that Quarry is a "mine" and the hard rock products extracted from it are "minerals" within the meaning of the Public Resources Code; therefore, Sukut was entitled to record and enforce a mining lien under Civil Code[1] section 3060. Sukut alternatively contends it could enforce a conventional mechanic's lien under section 3110. Based on our conclusion the quarry at issue here was not a mine within the meaning of section 3060 and, further, that under the doctrine of judicial estoppel Sukut is barred from arguing it was entitled to enforce a mechanic's lien, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Sukut alleged in its complaint a cause of action for foreclosure of a mechanic's lien against Rimrock, Otay and Doe defendants, and alleged causes of action for breach of contract, common counts and enforcement of promissory note against Rimrock and Doe defendants. Sukut attached to the complaint a copy of a promissory note in which Rimrock agreed to pay Sukut $1,562,744.30 plus interest approximately four months later. Sukut also attached to the complaint a copy of a mechanic's lien it had recorded in September 2008, which states that Rimrock owed Sukut $1,562,744.30 plus interest, because Sukut had completed "surface mining [of] aggregate materials" at Quarry.

It is undisputed that between March 2007 and April 2009, Rimrock operated Quarry, which produced rock aggregate that is used in construction for, among other things, road base, asphalt, concrete and pipe bedding. The rock is extracted by explosives and taken directly from the ground surface; the quarry operation removes, and lowers, the top surface of the ground.

Rimrock moved for summary adjudication, which the trial court granted on grounds there was no triable issue of material fact that the quarry was not a mine. The court stated, "[Sukut] filed a mechanic's lien to secure payment for 'surface mining [of] aggregate materials.' Although the lien does not state what code section the lien is based on, in its opposition to [Rimrock's] demurrer, Sukut argued it has a mining lien pursuant to [section 3060]." Citing the Public Resources Code and relevant case law, the court concluded, "Although

---

[1] All statutory references are to the Civil Code unless otherwise stated.

a quarry may be a surface mine, the quarry here was not a mine. [Rimrock] was breaking up and removing hard rock. There is no evidence that minerals were extracted therefrom." The cause of action for foreclosure of a mechanic's lien was accordingly dismissed with prejudice.

In a stipulated judgment, Sukut was awarded $1,954,812.30 for its breach of contract cause of action, computed as follows: the principal sum of $1,562,744.30, plus interest in a sum of $321,539, plus $70,529 in attorney fees. Sukut's causes of action for common counts and enforcement of promissory note were dismissed with prejudice.

## DISCUSSION

Sukut contends, "If [Quarry] is a mine under California law, the activities of Sukut would clearly entitle Sukut to record and enforce a mining lien under [section 3060]." The parties agree this case turns on the statutory definition of a "mining claim" as used in section 3060, and rely on the definitions of "mine" and "minerals" in Public Resources Code sections 2200 and 2005 respectively.

### Standard of Review

■ We review both questions of law and an order granting summary adjudication de novo. (*United Rentals Northwest, Inc. v. Snider Lumber Products, Inc.* (2009) 174 Cal.App.4th 1479, 1484 [95 Cal.Rptr.3d 471]; *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 453 [30 Cal.Rptr.3d 797, 115 P.3d 77].) We review questions of statutory interpretation "seeking, as always, to ascertain the Legislature's intent so as to give effect to the law's purpose." (*In re Corrine W.* (2009) 45 Cal.4th 522, 529 [87 Cal.Rptr.3d 691, 198 P.3d 1102]; see *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) "We begin with the statute's plain language, as the words the Legislature chose to enact are the most reliable indicator of its intent. [Citation.] But if 'the text alone does not establish the Legislature's intent clearly, we must turn to other sources for insight . . . .' " (*In re Corrine W.*, at p. 529.)

If "statutory text is susceptible of more than one reasonable interpretation, we will consider ' "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*Elsner v. Uveges, supra*, 34 Cal.4th at p. 929; see *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775–776 [72 Cal.Rptr.2d 624, 952 P.2d 641].) "Ultimately we choose the construction that comports most closely with the apparent intent of the

lawmakers, with a view to promoting rather than defeating the general purpose of the statute." (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].)

### Applicable Law

■ " 'Mechanics' liens are entirely of statutory creation, and the statute must be looked to both for the right to the lien and the mode by which it can be enforced. The right to a mechanic's lien depends upon a compliance with the statute, and in order that a valid lien may arise and be enforced, the claimant must strictly, or at least substantially, observe and comply with the provisions of the statute, none of which may be regarded as unessential.' " (*Holm v. Bramwell* (1937) 20 Cal.App.2d 332, 334 [67 P.2d 114].)

Section 3060[2] states: "Any person who performs labor in any mining claim or claims, or in or upon any real property worked as a mine, either in the development thereof or in working thereon by the subtractive process, or furnishes materials to be used or consumed therein, has a lien upon the same and the works owned and used by the owners for milling or reducing the ores from the same, for the value of the work or labor done or materials furnished by each respectively . . . ."

■ More than a century ago, the California Supreme Court clarified the definition of a "mining claim" as used in former section 1183, the predecessor statute to section 3060: "A 'mining claim,' as the term is used in the statutes of the United States, is that portion of a vein or lode and of the adjoining surface, or of the surface and subjacent material, to which a claimant has acquired the right of possession by virtue of a compliance with the laws of the United States and the local rules and customs of miners. [Citations.] Independent of acts of Congress, providing a mode for the acquisition of title to the mineral lands of the United States, the term 'mining claim' has always been applied to a portion of *such* lands to which the right of exclusive possession and enjoyment, by a private person or persons, has been asserted by actual occupation, or by compliance with local mining laws, or rules, usages, or customs."[3] (*Williams v. S. C. Mining Association* (1884) 66 Cal. 193, 198 [5 P. 85] (*Williams*).)

---

[2] We note that section 3060 has been amended and effective July 1, 2012, the statute will incorporate a provision stating, "As used in this section, 'mine' means a mining claim or real property worked on as a mine."

[3] The court in *Williams* concluded the definition of a "mining claim" was inapplicable to the grant at issue in that case, reasoning: "The right of the defendant, the Santa Clara Company, to a portion of the *Rancho Los Capitancillos*, or to a portion of the *Pueblo* lands of San José, and to extract ores therefrom, in no way depended upon a claim to the possession made in recognition of and in conformity to local rules adopted by miners of a mining district, or in accordance with the usages or customs of a locality. The defendant derived its title, as would seem, from the Mexican or Spanish government to the larger tract; certainly so, as to the

■ A year later, the United States Supreme Court, in the context of a claim brought under the Tariff Act of 1874, Revised Statutes of the United States, title XXXIII (Sept. 21, 1922, ch. 356, 42 Stat. 858), distinguished a quarry from a mine based on the common usage of the terms: "The words used are not technical, either as having a special sense by commercial usage, nor as having a scientific meaning different from their popular meaning. They are the words of common speech, and, as such, their interpretation is within the judicial knowledge, and, therefore, matter of law. Webster, in his Dictionary, defines the noun *mineral* as 'any inorganic species having a definite chemical composition,' and *ore* as 'the compound of a metal and some other substance, as oxygen, sulphur, or arsenic, called its *mineralizer*, by which its properties are disguised or lost.' The word *mineral* is evidently derived from *mine*, as being that which is usually obtained from a *mine*, and, accordingly, Webster defines the latter as 'a pit or excavation in the earth from which metallic ores or *other mineral substances* are taken by digging, distinguished from the pits from which stones only are taken and which are called quarries.' " (*Marvel v. Merritt* (1885) 116 U.S. 11, 12 [29 L.Ed. 550, 6 S.Ct. 207] (*Marvel*).)[4]

---

*Pueblo* land. We take notice that no patent, based upon 'mining claims,' could have been issued under any act of Congress for the whole, or for [1,109] acres, of the *Rancho Los Capitancillos*. The plaintiff could not acquire the statutory lien upon the lands of the Santa Clara Company, simply because the statute does not authorize it." (*Williams, supra*, 66 Cal. at pp. 198–199.)

[4] We note that *Marvel* has not been overruled, despite the fact that in the context of a different statute, the 1916 Stock-Raising Homestead Act (Act; 43 U.S.C. § 291 et seq.), the United States Supreme Court classified gravel as mineral in *Watt v. Western Nuclear, Inc.* (1983) 462 U.S. 36, 44 [76 L.Ed.2d 400, 103 S.Ct. 2218] (*Watt*). The court first concluded that when Congress reserved to the United States title to all the coal and other minerals in lands patented under the Act, "The legal understanding of the term 'minerals' prevailing in 1916 does not indicate whether Congress intended the mineral reservation in the [Act] to encompass gravel." (*Watt, supra*, at p. 44.) The court therefore relied on the Act's purpose and concluded that the mineral reservation in the Act includes "substances that are mineral in character (*i. e.*, that are inorganic), that can be removed from the soil, that can be used for commercial purposes, and that there is no reason to suppose were intended to be included in the surface estate." (*Watt, supra*, at p. 53.) The court emphasized, "Insofar as the purposes of the [Act] are concerned, it is irrelevant that gravel is not metalliferous and does not have a definite chemical composition. What is significant is that gravel can be taken from the soil and used for commercial purposes." (*Watt, supra*, at p. 55.) The court also supported its conclusion by referring to "federal administrative and judicial decisions over the past half-century [which] have consistently recognized that gravel deposits could be located under the general mining laws until common varieties of gravel were prospectively removed from the purview of those laws by the Surface Resources Act of 1955." (*Watt, supra*, at p. 57.) Finally, the court relied on the principle of statutory construction which favors the sovereign: " '[N]othing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.' " (*Watt, supra*, at p. 59.) The court's conclusion in *Watt* is not applicable to this case, which is not governed by the Act, and does not involve a land grant or sovereign rights.

Similarly, Black's Law Dictionary defines a "mining claim" as "A parcel of land that contains precious metal in its soil or rock and that is appropriated by a person according to established rules and customs known as the process of location." (Black's Law Dict. (9th ed. 2009) p. 1085, col. 2, italics omitted.) Further, a "mine" is a "mineral deposit; a place containing a mineral deposit." (*Id.* at p. 1084, col. 1.) A "mineral" is "any natural inorganic matter that has a definite chemical composition and specific physical properties that give it value." (*Ibid.*)

■ In evaluating whether the lien at issue here is a mining lien, it is instructive to review the development of California's laws regarding liens: "Originally there were but two classes of liens in California. They were liens on agricultural lands and liens on mining claims. In describing the lienable lands in the two classifications in *California Corrugated C. Co.* v. *Stewart* [(1920)] 215 Cal. 120 [8 P.2d 1013], it was said: [¶] 'The Mechanic's Lien Law provides for two distinct categories of liens. They are, first, liens for labor and materials employed or used in the construction of "any building, wharf, bridge, ditch, flume, aqueduct, well," etc., and, secondly, liens for labor and materials employed and used on mining claims. . . . "[T]he land upon which any building, improvement, well or structure is constructed, together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof, to be determined by the court on rendering judgment, is also subject to the lien." . . . [I]t has been held uniformly with reference to the second category, that when the labor and materials are employed and used on a mining claim, the mechanic's lien covers the entire mining claim. [Citations.] In such cases no question of fact as to the extent of land required for the convenient use and occupation of structure or improvement is presented. As a matter of law the entire mining claim is subject to the lien." (*Standard Pipe etc. v. Red Rock Co.* (1943) 57 Cal.App.2d 897, 900–901 [135 P.2d 659], citation omitted.)

■ In *Baker v. Waite* (1958) 158 Cal.App.2d 379 [322 P.2d 512], in which the trial court found that the respondents were entitled to liens for unpaid wages arising from employment performed as miners, the appellate court elaborated on the contours of a "mining claim" and the definition of "mine." The appellate court explained the factual background: "Speaking generally, the area has long been known as one of the areas of the state producing chromite commercially and chromite had been mined therefrom at various times. The earlier operators had extracted chromite by methods which included both tunneling and open cut operations and had dumped tailings on the property and left them to lie there. A considerable part of the mining done by respondent and his assignors consisted in reworking the old tailings . . . ." (*Id.* at p. 381.) In response to a contention that the work done in reworking the old tailings was not work for which a lien can be allowed because such work would not constitute mining, the court ruled: "We think it must be held

that where, as in this case, tailings of early mining operations have been left upon the mining claim and have been abandoned by those who placed them there they belong to the owner of the claim as a part thereof and that the work of extracting values therefrom undertaken later must be held to be mining such as affords ground for the allowance of a miner's lien upon the land. 'In a broad or enlarged sense the term "mine" denotes the vein, lode, or deposit of mineral, and is also used to denote the place where, or the parcel of land on which, such mineral vein or deposit is found.' " (*Id.* at pp. 383–384.)

The California Supreme Court stated that a quarry "is distinguished from a mine in the fact that it is usually open at the top and front . . . and, in the ordinary acceptation of the term, in the character of the material extracted . . . . It is a place, generally open at top and front, from which rock or stone is extracted solely because of its value for use elsewhere, just as gold or other precious metals are removed from a mine . . . ." (*In re Kelso* (1905) 147 Cal. 609, 610–611, 614 [82 P. 241] [invalidating an ordinance that stated, " 'No person, company or association shall maintain or operate any rock or stone quarry within . . . the city and county of San Francisco . . . .' "].)

In *Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 540 [48 Cal.Rptr.2d 778, 907 P.2d 1324], footnote omitted, a case addressing whether the " 'diminishing asset' doctrine is applicable to a mining operation which is carried on as a legal nonconforming use under a zoning ordinance that presently excludes mining from the permissible uses of the property," the court quoted *In re Kelso, supra,* 147 Cal. 609 and noted, "While mining is the all-encompassing term, extracting hard rock is commonly referred to in the industry as 'quarrying.' " (*Hansen, supra,* at p. 544 & fn. 7.)

In *Bambauer v. Menjoulet* (1963) 214 Cal.App.2d 871 [29 Cal.Rptr. 874] (*Bambauer*), the court denied an action for declaratory relief brought by a plaintiff who sought one-half interest in the defendant's property based on a deed of trust that included a reservation from the deed of " 'all mineral, and oil rights, and in and to all minerals and oils in the demised premises.' " (*Id.* at p. 872.) The defendant had given a third party the exclusive right to extract gravel deposits from the land that the plaintiff claimed. (*Ibid.*) The Court of Appeal concluded that the land gravel was not a mineral; therefore, the plaintiff's claim failed. (*Id.* at p. 874.)

The *Bambauer* court distinguished mineral from gravel: "Thus we are asked to interpret the meaning of the word 'mineral' in relation to the substance 'gravel' . . . . Resort to the generic classification of matter into the categories of animal, vegetable and mineral, leads to the absurd conclusion

that the soil itself would be reserved, and the conveyance nullified." (*Bambauer, supra*, 214 Cal.App.2d at p. 873.) The court resolved the issue by relying on case law stating, " ' "It is true that commercial gravel belongs to the mineral kingdom in that it is inorganic and that it is formed by nature alone. But there is an important distinction between it and any of the so-called minerals as recognized by the authorities. Practically speaking, all the definitions of the word 'mineral' agree that such a substance must always have a definite chemical composition by which it can be easily recognized, in whatever part of the earth it may be found. There can be no such uniformity in the chemical content of gravel deposits, for the reason that this depends entirely upon the character of the mineral deposits which have contributed to their formation. And upon the character, quantity, and proximity of the minerals to the gravel deposit, their susceptibility to erosion, the violence with which the erosion is accompanied, the duration of the eroding process, as well as various other facts, depends the size of the pebbles and the quality of the deposit as commercial gravel. There is nothing constant in the character of commercial gravel by which to identify it as a mineral, except that it consists of broken fragments of rock mingled with finer material, such as sand and clay. Nothing definite can be said of its chemical composition as can be said of the minerals. Commercial gravel is simply a jumbled mass of fragments of various minerals (rocks). Science, at least, cannot accept as a distinct subdivision of the mineral kingdom any substance whose character and attributes are so composite and fluctuating.["] ' " (*Id.* at p. 874.)

*Analysis*

■ We conclude Sukut is not entitled to enforce a mining lien under section 3060. The term "mining claim" was used in the predecessor statute, and has been interpreted by the California Supreme Court in *Williams, supra*, 66 Cal. at page 198 to mean a portion of a vein or lode and of the adjoining surface to which a claimant has acquired a right of possession. Black's Law Dictionary defines the term similarly. The term "mining claim" is used in the current version of section 3060, and therefore we presume it has the same meaning. ■ " 'It is a familiar rule that where a statute which has been judicially construed is re-enacted in the same or substantially the same terms, the legislature is presumed to be familiar with its construction and to have adopted it as part of the law, unless a different construction is expressly required.' " (*Hunt v. Superior Court* (1949) 93 Cal.App.2d 504, 507 [209 P.2d 411].)

Here, Sukut does not claim its work at Quarry involved a vein, lode or ore deposit, or that it has acquired a right of possession to the adjoining surface. Rather, it is undisputed Sukut worked on crushing rocks used for, among other things, constructing roads. We note that both the United States Supreme

Court in *Marvel, supra,* 116 U.S. 11 and the California Supreme Court in *In re Kelso, supra,* 147 Cal. 609 applied the ordinary meaning of the terms to distinguish between a quarry from a mine based on the materials extracted.

 Sukut's claims do not substantially comply with the requirements of a mining lien as defined by the California Supreme Court in *Williams, supra,* 66 Cal. 193. "[T]he legislature has seen fit to limit the benefit of the lien to particular classes, and we are not at liberty to extend it to others." (*Morse v. De Ardo* (1895) 107 Cal. 622, 626 [40 P. 1018] [reaffirming the holding in *Williams,* and concluding that land held under an agricultural patent was not subject to a mining lien].) " 'It is held in a number of cases that provisions relating to the creation, existence or right to the lien, being in derogation of the common law, should be strictly construed, while provisions relating to the enforcement of the lien after it has once attached, being remedial in character, should be liberally construed.' " (*Burr v. Peppers Cotton Lumber Co.* (1928) 91 Cal.App. 268, 273 [266 P. 1025].)

Sukut relies on an Attorney General's opinion which, in interpreting the term "minerals" as used in Public Resources Code section 2005 for purposes of the Surface Mining and Reclamation Act of 1975 (SMARA) (Pub. Resources Code, §§ 2710–2795), concluded that gravel is a "mineral." (66 Ops.Cal.Atty.Gen. 79, 82 (1983).)

The Legislature in 1939 defined the term "mine" in the Public Resources Code as "all mineral bearing properties of whatever kind or character, whether underground, or in a quarry or pit, or any other source from which any mineral substance is or may be obtained." (Pub. Resources Code, § 2200; see also *Hansen Brothers Enterprises, Inc. v. Board of Supervisors, supra,* 12 Cal.4th at pp. 544–545 & fn. 7.) In 1975, the Legislature defined "Minerals" to mean "any naturally occurring chemical element or compound, or groups of elements and compounds, formed from inorganic processes and organic substances, including, but not limited to, coal, peat, and bituminous rock, but excluding geothermal resources, natural gas, and petroleum." (Pub. Resources Code, § 2005.)

The Attorney General's opinion rejected what it termed "the more traditional view that gravel is not a mineral" (66 Ops.Cal.Atty.Gen., *supra,* at p. 81), and concluded, in light of SMARA's goals, which include encouraging the extraction of minerals and protecting the environment by reclaiming the mined lands, "[W]e have little difficulty in broadly reading the scope of [SMARA] and including gravel as a mineral under its provisions" (66 Ops.Cal.Atty.Gen., *supra,* at p. 83).

Citing to *Pariani v. State of California* (1980) 105 Cal.App.3d 923, 934 [164 Cal.Rptr. 683] (*Pariani*) which, like *Bambauer,* does not classify gravel

as minerals, the Attorney General conceded that in certain contexts that different classification might be appropriate. (66 Ops.Cal.Atty.Gen., *supra*, at pp. 80–81.) The appellants in *Pariani* held patents to land issued by the State of California, which reserved to itself rights to minerals found on the lands. (*Pariani*, at p. 926.) An issue in the case was whether the term "all other mineral deposits" in the relevant section of the Public Resources Code applied to the geothermal resources underlying the patented lands. (*Pariani*, at pp. 930–931.) Relying on *Bambauer*, appellants contended the geothermal resources were not minerals because they lacked "definite chemical composition," and consisted merely of heat. (*Pariani*, at p. 934.) The *Pariani* court broadened the definition of "mineral," concluding, "the word 'mineral' is used in many senses and does not have definite meaning; in its broadest sense, it encompasses that vast realm of everything other than animal or vegetable; but the word is necessarily subject to interpretation by reason of its context and particular usage. The term 'mineral' includes a substance of mineral character broadly defined which is commercially valuable when extracted from the land, but excludes ordinary materials commonly associated with surface use . . . ." (*Id.* at p. 934.) Accordingly, the court rejected a narrow, technical definition of minerals (*id.* at p. 935), concluding that either as a matter of statutory construction favoring the state as grantee of the patented lands, or as a matter of geological classification of the geothermal resources, the geothermal resources at issue qualified as "mineral deposits" under the applicable statute. (*Id.* at p. 937.)

■ " 'Opinions of the Attorney General, while not binding, are entitled to great weight. [Citations.] In the absence of controlling authority, these opinions are persuasive . . . .' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].) We conclude the Attorney General's opinion is not binding on us because the California Supreme Court's holding in *Williams, supra*, 66 Cal. 193, which arises in the specific context of a mining lien, is controlling authority. In that regard, we also need not rely on the definitions of "mine" and "minerals" in the Public Resources Code because those definitions were adopted decades after the mining lien claim law, and that code serves a broader purpose than the more specific definition of a "mining claim" for purposes of a section 3060 mining lien.

Further, the Attorney General's opinion arises in the context of SMARA, a statutory scheme enacted to regulate surface mining to avoid adverse environmental impact; balance product and conservation of minerals while "giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment"; and eliminate residual hazards to the public

health and safety. (Pub. Resources Code, § 2712, subd. (b).)[5] Here, the context of the parties' dispute does not implicate SMARA; rather, it is a dispute regarding foreclosure of a mining lien based on the operation of a quarry. Finally, even the Attorney General's opinion noted that under California case law, in different contexts, gravel may be excluded from the definition of a mineral.

Sukut alternatively contends, based upon the language of the mechanic's lien statutes, and in particular sections 3110,[6] 3102[7] and 3106,[8] it was entitled to record and have the court enforce its mechanic's lien, in view of the nature of the labor, materials, services and equipment it furnished Rimrock, and the facilities for which it provided these services. Sukut contends it had raised this issue in opposing summary adjudication, but the trial court did not address it.

Otay and Rimrock counter that the trial court had addressed the issue and ruled that Sukut in its opposition to the demurrer took the position that the lien was a mining lien under section 3060, and thus had in effect applied judicial estoppel to bar Sukut's claim to a section 3110 lien. They request we do the same.

*Applicable Law*

 " ' " 'Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.] . . .' " [Citation.] The doctrine [most

---

[5] On appeal, Sukut recognizes that it did not present to the trial court documents regarding the legislative history of SMARA, which it requests we judicially notice. Under Evidence Code sections 452 and 459, we deny the request because SMARA is inapplicable here. We also do not address other authority Sukut cites that interprets SMARA.

[6] Section 3110 provides: "Mechanics, materialmen, contractors, subcontractors . . . and all persons and laborers of every class performing labor upon or bestowing skill or other necessary services on, or furnishing materials or leasing equipment to be used or consumed in or furnishing appliances, teams, or power contributing to a work of improvement shall have a lien upon the property upon which they have bestowed labor or furnished materials or appliances or leased equipment for the value of such labor done or materials furnished and for the value of such appliances . . . ."

[7] Section 3102 states: " 'Site improvement' means the demolishing or removing of improvements, trees, or other vegetation located thereon, or drilling test holes or the grading, filling, or otherwise improving of any lot or tract of land or the street, highway, or sidewalk in front of or adjoining any lot or tract of land, or constructing or installing sewers or other public utilities therein, or constructing any areas, vaults, cellars, or rooms under said sidewalks or making any improvements thereon."

[8] Section 3106 provides: " 'Work of improvement' includes but is not restricted to the construction, alteration, addition to, or repair, in whole or in part, of any building," and applies to the entire structure or scheme of improvement as a whole.

appropriately] applies when: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." ' [Citations.] [¶] ' " 'The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. [Citation.]' " ' [Citation.] Consistent with these purposes, numerous decisions have made clear that judicial estoppel *is an equitable doctrine*, and its application, even where all necessary elements are present, is discretionary." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422 [30 Cal.Rptr.3d 755, 115 P.3d 41].) " 'Judicial estoppel is "intended to protect against a litigant playing 'fast and loose with the courts.' " ' " [Citation.] "It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite." ' " (*The Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 841 [108 Cal.Rptr.3d 651].)

### Background

We set forth in detail the facts about Sukut's claims regarding the lien it recorded because they lead to our conclusion to apply judicial estoppel.

As the trial court concluded in granting summary adjudication, the lien here does not specify whether it is a section 3060 mining lien or, as Sukut claimed in the alternative, a section 3110 lien. On the lien document, in a space designated for Sukut to identify the "work and materials furnished by claimant," Sukut represents that the lien applies to Sukut's "surface mining [of] aggregate materials."

Sukut alleges in its complaint it contracted with Rimrock to "furnish all labor, materials, services, materials [*sic*], equipment, tools and storage facilities for surface mining of aggregate materials from a quarry owned and/or operated by Rimrock and/or Otay, and hauling the rock materials mined from the quarry to crushing operations owned and/or operated by Rimrock and/or Otay."

Rimrock demurred to Sukut's foreclosure of mechanic's lien cause of action, arguing the work of hauling stones connected with a quarry was not a "work of improvement" within the meaning of section 3110 and, even if Sukut were asserting a mining claim under section 3060, it would fail because the quarry is not a mine, and the rocks extracted from it are not minerals.

In opposing the demurrer, Sukut relied solely on section 3060, claiming, "The demurrer argues that the complaint does not allege that the work was performed at a 'mine' . . . that quarry and related rock crushing facilities are not a mine. This contention is contradicted by [Public Resources Code sections 2200 and 2735,] which include definitions of a mine and surface mining operations." Sukut concluded, "The quarry operation for which Sukut's work was performed is clearly a mining operation for which a mining lien under [section 3060] can be recorded." Sukut did not refer to section 3110 or claim it had recorded a different kind of lien.

The trial court overruled the demurrer on the specific ground Sukut had advanced, ruling, "Given the broad definition of a mine, [it] is apparent that a quarry may be a mine." The court rejected contrary arguments by Rimrock and Otay and concluded, "removing rock (overburden) can constitute surface mining."

In subsequent discovery, Sukut reiterated its claim made in opposing the demurrer. Rimrock and Otay propounded special interrogatories on Sukut, asking, "Do you base your . . . cause of action[] for foreclosure of mechanic's lien[] on section 3060?" Sukut responded, it "ha[d] already disclosed in its pleadings and its opposition to the Rimrock demurrer its contention that its claim against Rimrock is enforceable as a lien against the subject property, and the facts supporting this contention."

In their motions for summary adjudication, Rimrock and Otay challenged Sukut's claim the lien was for mining, and requested the trial court take judicial notice of Sukut's opposition to the demurrer.

Sukut opposed summary adjudication and changed positions, arguing section 3060 applied, but, in the alternative, section 3110 also applied. Sukut's complete argument on this point stated: "The work performed by Sukut at the quarry also fits the description the [sic] of labor materials [sic] and services for which a Mechanic's Lien can be recorded under [section] 3110, and the quarry operations are a 'work of improvement' for which a lien can be recorded under [section] 3106. Whether characterized as a 'mining lien' or a 'mechanic's lien', Sukut had the constitutional right to record a lien to secure the unpaid value of the work which it had performed."

In reply, Rimrock and Otay addressed Sukut's inconsistent positions, arguing, "In its demurrer opposition, Sukut made no attempt to establish a mechanic's lien; its sole argument was that it could assert a mining lien claim. Sukut got past the pleading stage, but has since refused to allow Rimrock to 'test the pleadings,' by improperly evading discovery requests asking whether it bases its lien claim on the mining lien provision. However,

Sukut eventually conceded that its demurrer opposition provides the basis of its contention. Sukut now changes course and 'hedges its bets' by referring to the general mechanic's lien provision. The fact that Sukut still cannot commit to one of the two mutually exclusive lien provisions shows that it is not entitled to a lien under either provision." (Fn. & citation omitted.) Rimrock and Otay also included copies of Sukut's responses to the special interrogatories in their motion for summary adjudication.

At the motion hearing, Rimrock and Otay raised the issue of Sukut's inconsistent positions. The trial court told Sukut's counsel, "Well, basically, you're talking, though, about changing a pleading into something different than what you have now." The trial court told the parties at the end of the hearing, "I'll take a look at my decision on the demurrer previously too as to whether or not there is any flip-flop on this."

The trial court rejected Sukut's claim it had a mining lien under section 3060, but did not address Sukut's alternative argument under section 3110. We therefore infer the trial court concluded that because Sukut had taken inconsistent positions, it was bound by its claim made in opposition to the demurrer.

*Analysis*

■ Here, the *MW Erectors* factors are met for us to exercise our discretion to apply the doctrine of judicial estoppel: Sukut is the same party that took the position regarding the lien in the judicial proceedings of the demurrer and summary adjudication; Sukut's position it had a mining lien under section 3060 resulted in its success at the demurer stage; its subsequent position that it has a mechanic's lien under section 3110 is inconsistent because liens are creatures of statute and apply in specific circumstances; finally, Sukut has not argued it took the first position as a result of ignorance, fraud or mistake, and no evidence supports such a claim. We note that the claimant bears the threshold burden of establishing the lien. (Accord, *Hayward Lumber etc. Co. v. Starley* (1932) 124 Cal.App. 283, 288 [12 P.2d 66] [applying this principle in the context of mechanic's liens].)

Sukut's lien and complaint referred to its "mining" activity, giving the reasonable impression Sukut had recorded a mining lien under section 3060, a view Sukut specifically confirmed in opposing the demurrer and in its response to the special interrogatory. In apparent reliance on Sukut's assertion, Otay abandoned arguments regarding the applicability of section 3110 in its summary adjudication motion. As a matter of equity, and in the interest of preventing Sukut from " ' " ' "playing 'fast and loose with the courts' " ' " ' "

(*The Swahn Group, Inc. v. Segal, supra,* 183 Cal.App.4th at p. 841), we conclude Sukut is judicially estopped from claiming its lien was valid under section 3110.

 In light of our conclusions the lien was not valid under section 3060 and judicial estoppel bars Sukut from seeking to enforce a mechanic's lien, we have no occasion to determine whether work on a quarry is a "work of improvement" for purposes of a section 3110 mechanic's lien.

### DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents Rimrock CA LLC and Otay Valley Quarry LLC.

McIntyre, Acting P. J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 14, 2011, S197831.