Filed 8/29/19

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PRECISION FRAMING SYSTEMS INC., | E069158 |
| Plaintiff and Appellant, | (Super.Ct.No. MCC1400466) |
| v. | OPINION |
| HENRY LUZURIAGA et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Gloria Trask and Angel M. Bermudez, Judges.⸸ Affirmed.

Tyler & Bursch, Jennifer L. Bursch, James A. Long, and Nada N. Higuera for Plaintiff and Appellant.

---

\* Pursuant to California Rules of court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, V, VI, and VII.

⸸ Judge Trask denied the motion to compel production of documents and summarily adjudicated one of the affirmative defenses. Judge Bermudez granted the motion for summary judgment, entered judgment, and awarded costs.

Law Offices of Jonathan C. Stevens and Jonathan C. Stevens for Defendants and Appellants.

Henry and Deborah Luzuriaga contracted with a general contractor for the construction of a commercial building. The general contractor, in turn, contracted with Precision Framing Systems, Inc. (Precision) for the framing, including the necessary trusses. And Precision contracted with Inland Empire Truss, Inc. (Inland) for the fabrication of the trusses. Precision never received full payment. Accordingly, it recorded a mechanic's lien claim.

Meanwhile, there was a problem with some of the trusses. There was much finger-pointing as to who was to blame. After Precision had already recorded its mechanic's lien claim, Precision and/or Inland came back to the site and repaired the trusses.

Precision filed this action to foreclose its mechanic's lien. Ms. Luzuriaga filed a cross-complaint. The trial court granted summary judgment against Precision on its complaint. It ruled that the mechanic's lien claim was filed prematurely — i.e., before Precision had "cease[d] to provide work." (Civ. Code, § 8414, subd. (a).)

Precision appeals. Its primary contention is that there was a triable issue of fact as to whether it had ceased to provide work, because (1) "ceas[ing]," within the meaning of the statute, can be a gradual process, (2) the repair of the trusses was not part of Precision's "work," (3) there was evidence that Precision completed all of its work before

2

it recorded its mechanic's lien claim, and (4) there was evidence that the repairs were done by Inland. Henry Luzuriaga and the Luzuriagas' bonding company cross-appeal.[1]

We will affirm. We agree with the trial court: The evidence showed, beyond a triable issue of fact, that Precision had not yet "cease[d] . . . work" when it recorded its mechanic's lien claim. This moots the cross-appeal.

I

FACTUAL BACKGROUND

The following facts are taken from the evidence introduced in connection with the motion for summary judgment.

The Luzuriagas undertook the construction of a veterinary hospital on a piece of property that they owned in Wildomar. They hired an architect and a general contractor. The general contractor, in turn, hired Precision as the framing subcontractor. Precision's contract stated that that the contact price was "for labor, lumber, trusses, and hardware necessary to complete the . . . project." (Capitalization altered.)

George Mears is the president of Precision. He testified that Precision was supposed to "supply and install[]" the trusses. In its interrogatory responses, Precision stated that its scope of work consisted of framing, including "procurement of materials (lumber[,] hardware and trusses)."

---

[1] Ms. Luzuriaga also cross-appealed, but we dismissed her because her cross-complaint is still being litigated.

3

Precision selected Inland to design and manufacture the trusses. As Mears put it, "Precision used Inland" for the trusses. Inland contracted solely with Precision and invoiced Precision, although Inland was paid directly by the construction lender.

Inland designed the trusses, based on the plans and specifications, and built them. However, the architect had to approve the truss design, incorporate it into his plans, and make sure they matched (redesigning his own plans if necessary). Thus, as the general contractor testified, the "truss details" were "ultimately[] the architect's responsibility."[2]

On July 24, 2013, Precision started work on the framing. On July 29, 2013, Inland delivered the trusses to the site. On August 2, 2013, Precision began installing the trusses.

On August 7, 2013, the city issued a correction notice relating to the trusses. It stated: "Truss bearing points are not as per plan . . . ." In the architect's opinion, this was because the trusses were not fabricated in accordance with the plan. On August 14, 2013, Precision notified Inland that the trusses were defective. Later in August 2013, Inland carried out some repairs to the trusses.

On December 9, 2013, the city issued a second correction notice relating to the trusses.

---

   **2**      Precision claims there was evidence that the architect designed the trusses. The cited portions of the record do not support this. The architect himself testified that he designed the floor plan, which specified the bearing points for the trusses — i.e., the points at which the rest of the building was supposed to support them — but he did not design the trusses themselves. We have found no other evidence contradicting this. The designs themselves are in the record and have Inland's logo on them.

4

On December 23, 2013, the general contractor and Precision's superintendent "walked the [p]roject" together. The general contractor found that Precision's work was complete and fully in compliance with the plans and specifications. At that point, according to both Mears and the general contractor, Precision had completed its scope of work. The city approved Precision's framing work.

Precision, however, never received full payment. Ms. Luzuriaga told Mears "she was not interested in paying Precision and told [him] to sue her." Accordingly, on January 2, 2014, Precision recorded its mechanic's lien claim for $53,268.16.

Sometime between January 2 and 29, 2014, the Luzuriagas changed the locks of the building, locking out all contractors.

Sometime between January 20 and 29, 2014, Mears met with the architect and the building inspector. At this meeting, he later testified, he first became aware of the correction notices.[3]

On January 29, 2014, Ms. Luzuriaga took the position that Precision's mechanic's lien claim was "premature" because it had not yet completed its scope of work, and in particular because the correction notices were still outstanding. She asked, "Does Precision . . . intend to return to the job and correct the issues that are pending?" Mears

---

[3] By August 14, 2013, Precision knew there was a problem with the bearing points of some of the trusses. Moreover, by December 31, 2013, it knew the building inspector had raised "a question" about the trusses. On January 9, 2014, it received Inland's engineering drawing of the proposed repair. On January 11, 2014, it asked Inland when it was going to do this repair. However, there is no evidence that it was aware specifically of the outstanding correction notices before the January meeting.

5

responded, "We intend on completing any work pursuant to our contract . . . [W]e are willing to meet and discuss any remaining scope . . . ."

On February 4, 2014, Precision told Ms. Luzuriaga that it could not determine whether the issues in the correction notice were within its scope of work because it was locked out.

On February 12, 2014, Ms. Luzuriaga told Mears that she would be at the site the following day. She continued, "If you would like to visit the project with respect to the City's correction notice . . . , you can come by then." Mears responded that he would and added, "The truss company will also be in attendance to make sure that the repairs were made. If they are not they will complete them then."

Meanwhile, Inland had prepared repair designs and had done the related structural calculations. On February 12 or 13, 2014, Inland carried out the repairs. Mears was present to "accompany" Inland, and he "helped coordinate the repairs."[4] The repairs themselves took two or three hours

---

[4] In interrogatory responses, however, Precision stated: "[O]n February 12, 2014, [Precision] conducted a repair per a correction notice issued by the City . . . ." Moreover, in a declaration, Mears testified: "On February 12, 2014, . . . Precision repaired some of the floor trusses . . . . [R]epresentatives of Inland . . . were on the site to witness/perform the truss repairs."

Ms. Luzuriaga testified that Inland "and/or" Precision carried out the repairs.

## II

## PROCEDURAL BACKGROUND

In 2014, Old Republic Surety Company (Old Republic) filed a complaint (Case No. SWC1400869) against Ms. Luzuriaga, Precision, and others.

Ms. Luzuriaga filed a cross-complaint against Precision and a host of other defendants.  Her operative (first amended) cross-complaint alleged that, at all relevant times, Precision lacked a contractor's license.  It also alleged that Precision's mechanic's lien claim had been filed prematurely.

Meanwhile, also in 2014, Precision filed a separate complaint (Case No. fMCC1400466) against the Luzuriagas, American Contractors Indemnity Company (American), and others.[5]  The operative (second amended) complaint asserted a single cause of action for foreclosure of mechanic's lien.  The Luzuriagas asserted various affirmative defenses, including that Precision "was an unlicensed contractor . . . ."

The trial court consolidated the two cases.

In 2015, Precision filed a motion for summary adjudication of the Luzuriagas' defenses.  The trial court granted summary adjudication in favor of Precision on the unlicensed contractor defense.

---

[5]     American was named as a defendant based on allegations that it had issued a bond enabling the Luzuriagas to obtain a release of Precision's mechanic's lien.

Because American's liability is derivative of the Luzuriagas', we will disregard its separate status.  Further references to "Luzuriaga" and "the Luzuriagas" will include American, unless the context otherwise requires.

In 2017, the Luzuriagas moved for summary judgment on Precision's complaint, on the ground that Precision had filed its mechanic's lien prematurely. The trial court granted the motion  and entered judgment accordingly.

Precision filed a timely notice of appeal. The Luzuriagas filed a timely notice of cross-appeal. However, we dismissed Ms. Luzuriaga as both an appellant and a respondent, because her cross-complaint against Precision (and others) was still pending.

III

CONSIDERATION OF THE MEARS DECLARATION

Precision contends that the trial court erred by taking judicial notice of Mears' declaration.[6] Because this goes to whether we can consider evidence from the declaration, we resolve it as a preliminary matter.

A.      *Additional Factual and Procedural Background.*

In support of their motion for summary judgment, the Luzuriagas asked the trial court to take judicial notice of declarations by Mears and by Roy Ryan, the general contractor, that had been filed in the case in 2015.

Precision did not object to this request. To the contrary, in its opposition, it cited and relied on the declarations.

At the hearing on the motion, the trial court noted that both sides had relied on the declarations but stated, "I can't take judicial notice of the declarations." Counsel for the

---

[6]      Despite making this argument, Precision repeatedly cites the Mears declaration.

8

Luzuriagas argued that the declarations were "central." The court responded, "So instead of taking judicial notice, you want me to consider the declarations with the evidence at the end?" Counsel for both sides agreed to this.

In its order granting the motion, the trial court stated: "The request for judicial notice . . . as to declarations of Mears and Ryan . . . is DENIED. The court may only take judicial notice of the existence of the declaration — not its contents." However, the order went on to cite and quote Mears' declaration.

B. *Discussion*.

Precision forfeited this contention, first, by failing to object to the request for judicial notice, and second, by agreeing that the trial court could use the declarations as evidence. (Evid. Code, § 353, subd. (a).)

Precision argues that this contention was preserved because the Luzuriagas relied exclusively on judicial notice, and the trial court ruled that it could not take judicial notice. The fact remains that Precision agreed that the trial court could consider the declarations, regardless of the theory under which it did so. Indeed, Precision's agreement rose to the level of inviting the asserted error. (See generally *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.)

Separately and alternatively, the trial court properly considered the declarations.

"'[W]hile courts are free to take judicial notice of the *existence* of each document in a court file, . . . they may not take judicial notice of the truth of *hearsay statements* in

9

decisions and court files.  [Citation.]'  [Citation.]"  (*Barri v. Workers' Comp. Appeals Bd.* (2018) 28 Cal.App.5th 428, 437.)

This is true, however, only if the hearsay is *inadmissible*.  "'The hearsay rule applies to statements contained in judicially noticed documents, and precludes consideration of those statements for their truth *unless an independent hearsay exception exists*.  [Citation.]'  [Citation.]"  (*Barri v. Workers' Comp. Appeals Bd.*, *supra*, 28 Cal.App.5th at p. 437, italics added.)  To put it another way, once the trial court takes judicial notice of the *existence* of a declaration, it *can* consider statements in the declaration for their *truth* if they are admissible under a hearsay exception.

*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548 — which the trial court cited below and Precision cites on appeal — is not to the contrary.  It merely held that a court cannot take judicial notice of the truth of another court's factual findings in a previous case.  (*Id.* at pp. 1560-1570.)  Such findings are inadmissible hearsay.  *Sosinsky* simply does not speak to *admissible* hearsay in court records.

Here, while the declarations were hearsay, they were *admissible* hearsay.  Under Code of Civil Procedure section 437c, subdivision (b), a declaration is admissible in support of or in opposition to a motion for summary judgment.  This constitutes an exception to the hearsay rule.  (*Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 756.)

If we were to accept Precision's contrary position, it would mean that, in connection with a motion for summary judgment, a party could not request judicial notice

10

of declarations previously filed in the case; however, it could use them as evidence by attaching them to an attorney's declaration authenticating them.  We see no point to this hypertechnical approach.

Thus, the trial court's ruling refusing to take judicial notice of the declarations was, technically, erroneous.  It appears, however, that it nevertheless proceeded to do the right thing — it considered the declarations for their truth.

IV

TIMELINESS OF THE MECHANIC'S LIEN CLAIM

As mentioned, Precision contends that there was evidence that its mechanic's lien claim was not premature.

"A trial court may only grant a motion for summary judgment if no triable issues of material fact appear and the moving party is entitled to judgment as a matter of law. [Citations.]" (*Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)  "In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)  "Whether the trial court erred by granting [the] motion for summary judgment is a question of law we review de novo. [Citation.]" (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.)

"A mechanic's lien is a claim against real property, which may be filed if a claimant has provided labor or furnished materials for the property and has not been paid.

11

[Citation.]"  (*Brewer Corp. v. Point Center Financial, Inc.* (2014) 223 Cal.App.4th 831, 839.)  Thus, "'[it] is a procedural device for obtaining payment of a debt [owed] by a property owner for the performance of labor or the furnishing of materials used in construction.'  [Citation.]"  (*North Bay Construction, Inc. v. City of Petaluma* (2006) 143 Cal.App.4th 552, 555.)

"Mechanics' lien law derives from our state Constitution . . . .  The mechanics' lien is the only creditors' remedy stemming from constitutional command and our courts 'have uniformly classified the mechanics' lien laws as remedial legislation, to be liberally construed for the protection of laborers and materialmen.'  [Citation.]"  (*Hutnick v. U.S. Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 462.)

"However, '"[a]lthough mechanic's lien laws should be liberally construed to protect those who have contributed skills, services or materials, towards the improvement of property, it has been recognized that lien laws are for the protection of owners as well as mechanic's lien claimants."'  [Citation.]"  (*Moorefield Construction, Inc. v. Intervest-Mortgage Investment Co.* (2014) 230 Cal.App.4th 146, 155.)

"The section of the Constitution referred to is not self-executing, and is inoperative except as supplemented by legislation.  [Citations.]"  (*Ferger v. Gearhart* (1919) 44 Cal.App. 245, 247, disapproved on other grounds in *Theisen v. County of Los Angeles* (1960) 54 Cal.2d 170, 182.)  ""'Mechanics' liens are entirely of statutory creation, and the statute must be looked to both for the right to the lien and the mode by which it can be enforced.  The right to a mechanic's lien depends upon a compliance with

12

the statute, and in order that a valid lien may arise and be enforced, the claimant must strictly, or at least substantially, observe and comply with the provisions of the statute, none of which may be regarded as unessential.'" [Citation.]" (*Sukut Construction, Inc. v. Rimrock CA LLC* (2011) 199 Cal.App.4th 817, 824.)

The crucial statute here is Civil Code section 8414, which provides:

"A [mechanic's lien] claimant other than a direct contractor may not enforce a lien unless the claimant records a claim of lien within the following times:

"(a) After the claimant ceases to provide work.

"(b) Before the earlier of the following times:

"(1) Ninety days after completion of the work of improvement.

"(2) Thirty days after the owner records a notice of completion or cessation."

Civil Code section 8414 is just the most recent in a series of statutes setting the earliest and/or latest time for recording a mechanic's lien claim. (Civ. Code, former § 3116, Stats. 1969, ch. 1362, § 2, p. 2762; Code Civ. Proc., former § 1193.1, subd. (c), Stats. 1951, ch. 1376, § 2, p. 3290; Civ. Code, former § 1187, 1 Ann. Code Civ. Proc., § 45 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 49.) Like the present version, most of them set the earliest time based on either the subcontractor's cessation of its own work or the completion (or cessation) of the overall work of improvement.[7]

---

[7] In 1887, the statute was amended to provide, "[A]ny trivial imperfection . . . shall not be deemed such a lack of completion as to prevent the filing of any lien . . . ." (Code Civ. Proc., former § 1187, Stats.1887, ch. 137, § 3, pp. 154-155.) In 1929,

While the triggers that were based on the completion of the overall work of improvement have varied, the triggers that were based on the subcontractor's cessation of its own work were all similar.

For example, the version enacted in 1919 required a subcontractor to file any mechanic's lien claim "after he has ceased to perform labor or furnish material, or both . . . ."  (Former Civ. Code, § 1187, Stats. 1919, ch. 146, § 1, p. 190.)

The version enacted in 1969 required a subcontractor to file any mechanic's lien claim "after he has ceased furnishing labor, services, equipment, or materials . . . ."  (Former Civ. Code, § 3116, Stats. 1969, ch. 1362, § 2, p. 2762.)

We perceive no relevant substantive difference between these various formulations.  Indeed, Civil Code section 8414 was intended to reenact the 1969 version "without substantive change."  (Cal. Law Revision Com. com., 12C West's Ann. Civ. Code (2012 ed.) foll. § 8414, p. 199.)  Accordingly, older cases construing and applying "ceas[ing]" remain good law.  (See *Century Superior Gunite, Inc. v. Rodriguez* (1981) 118 Cal.App.3d Supp. 12, 15 [case construing Civ. Code, former § 1187 is helpful in construing Civ. Code, former § 3116].)

Under every version of the statute, a mechanic's lien claim that is filed prematurely is void and cannot be enforced.  (*Marchant v. Hayes* (1898) 120 Cal. 137, 138-139; *McCreary v. Toronto Midway Oil Co.* (1918) 38 Cal.App. 17, 20.)

---

however, the "trivial imperfection" exception was deleted.  (Code Civ. Proc., former § 1187, Stats. 1929, ch. 870, § 1, p. 1928.)

14

Precision notes that the Merriam-Webster Dictionary defines "cease" as "to cause to come to an end *especially gradually*: no longer continue." (Merriam-Webster OnLine Dict. <https://www.merriam-webster.com/dictionary/cease> [as of Aug. 27, 2019], italics added.) It therefore argues that "the phrase 'ceases to provide work' does not require that all work be completely stopped prior to recording a lien. Instead, all that it required is, prior to recording, a contractor gradually cause to come to an end, the supply or availability of labor to a work of improvement."

We disagree. "Cease" means to end. Ending is required; ending gradually is optional.[8] If something is in the process of coming to an end, it may be *ceasing*, but it has not *ceased*. According to the Merriam-Webster use note, "cease" — as compared to such synonyms as "stop," "quit," "discontinue," and "desist" — "may add a suggestion of gradualness *and a degree of finality*." (Merriam-Webster Online Dict., *supra*, italics added.) As Luzuriaga argues, interpreting "cease" as meaning gradually coming to an end would make the moment when "ceasing" occurs unduly subjective and difficult to determine.

Precision also relies on the statutory definition of "work." "'Work' means labor, service, equipment, or material provided to a work of improvement." (Civ. Code, § 8048.) And "'work of improvement' means the entire structure or scheme of

---

**8**     The relevant definition of "cease" in the Oxford English Dictionary is "To leave off, discontinue . . . ." Oxford English Dictionary Online (3d ed. 2001) <https://www.oed.com/view/Entry/29342> (as of Aug. 27, 2019). It contains no similar connotation of gradualness.

15

improvement as a whole . . . ." (Civ. Code, § 8050, subd. (b).) Precision therefore argues that here, "the 'work of improvement' was the construction of a veterinary hospital, as opposed to discrete repairs or alterations made to the veterinary hospital."

This argument assumes what it seeks to prove — that the repairs were "discrete" from the construction. However, the statutory definition of "work of improvement" includes the "[c]onstruction, alteration, [or] *repair*, . . . in whole or in part, of . . . a building . . . ." (Civ. Code, § 8050, subd. (a)(1), italics added.) Thus, a work of improvement, as a whole, can include both construction and repairs.

On the other hand, Luzuriaga argues that the definitions of "work" and "work of improvement" are irrelevant; the only question is whether Precision "had ceased its work on the Project." But this argument, too, assumes what it seeks to prove — that the repairs were part of "the Project."

Because the issue is whether Precision had ceased to provide "work," and because "work" is defined in terms of the overall "work of improvement," we conclude that this issue must be analyzed in terms of whether the repairs were part of the "scheme of improvement as a whole."

As Precision notes, case law supports this view.

For example, in *Nevada County Lumber Co. v. Janiss* (1938) 25 Cal.App.2d 579, the trial court found that the construction of two cabins was complete on December 20,

16

1935, and therefore a subcontractor's lien claim filed on March 16, 1936 was timely.[9] (*Id*. at p. 582.) The evidence showed that a tenant had moved into one of the cabins on December 2, 1935. (*Ibid*.) Before then, however, the sewer pipes had been accidentally blocked with cement. (*Id*. at p. 583.) Accordingly, between December 16 and 20, 1935, the general contractor removed and replaced the sewer pipes. (*Ibid*.)

The appellate court upheld the finding that the work was not complete until the sewer pipes were replaced. (*Nevada County Lumber Co. v. Janiss*, *supra*, 25 Cal.App.2d at pp. 582-584.) It noted that "[t]he fulfillment of the contract in question required the construction of a suitable sewer system to connect the building with a septic tank." (*Id*. at p. 583.) Thus, it described the replacement as "substantial work necessary to the completion of the contract . . . ." (*Id*. at p. 582.)

Similarly, in *Hundley v. Marinkovich* (1942) 53 Cal.App.2d 288, the trial court found that the construction of a building was complete on November 9, 1939, so that a subcontractor's mechanic's lien claim filed on December 21, 1939 was untimely.[10] (*Id*. at pp. 289-290.) The subcontractor had finished all other work on the building on November 8, 1939, but on November 29, 1939, it had replaced a defective lock part with a new part worth $4.12. (*Id*. at p. 290.)

---

[9]    At the time, the applicable statutory deadline was 90 days after completion. (*Nevada County Lumber Co. v. Janiss*, *supra*, 25 Cal.App.2d at p. 581.)

[10]    At the time, the applicable statutory deadline was 30 days after completion. (*Hundley v. Marinkovich*, *supra*, 53 Cal.App.2d at pp. 291.)

The appellate court upheld the trial court's finding. (*Hundley v. Marinkovich*, *supra*, 53 Cal.App.2d at pp. 292-293.) It rejected the subcontractor's argument "that a substitution or replacement of material, at the demand of the owner or the original contractor" extended the time to record a mechanic's lien claim. (*Id.* at p. 292.) It relied on the trial court's additional finding that the lock part "constituted no part of the construction of said building," as well as on the fact that labor had ceased and the owners had taken possession and had recorded a notice of completion. (*Id.* at pp. 290, 293.)

In summary, then, while the outcomes in *Nevada County* and *Hundley* were opposite, their underlying analytic approach was the same:  They looked to whether the repairs were part of the overall scheme that constituted the work of improvement.[11]

Luzuriaga argues that *Nevada County* and *Hundley* are irrelevant because they involved belated lien claims, rather than premature lien claims. (It could also be argued that they turned on the completion of an overall work of improvement, rather than the cessation of an individual subcontractor's work.)  Nevertheless, they speak to the larger question of whether the time to file a lien claim runs from repairs done after other work is complete.  With respect to an individual subcontractor, they support Precision's contention that this turns on the subcontractor's scope of work.

---

[11]     Precision also cites *Grettenberg v. Collman* (1931) 119 Cal.App. 7.  That case held that various repairs performed after a building was otherwise complete did not extend a subcontractor's time to file a lien claim. (*Id.* at pp. 9-11.)  It relied, however, on the statutory provision that "trivial imperfections" did not prevent completion. (*Ibid.*)  As we have noted (fn. 7, *ante*), this provision was deleted in 1929.  It has been held that the deletion intentionally eliminated the "trivial imperfection" exception. (*Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1213-1214.)

We turn, then, to whether there was a triable issue of fact as to whether the repairs were part of the "work" that Precision was to provide to the "work of improvement."

Precision's contract provided that its price was for, among other things, the "trusses . . . necessary to complete the . . . project." (Capitalization altered.) In Precision's view, this did not require it to design the trusses; rather, it was up to the architect to design the trusses, and all Precision had to do was to supply trusses in conformity with his designs. Accordingly, the repairs were not within its scope of work.

We disagree, for two reasons. First, even assuming the architect did design the trusses, the contract called for Precision to supply the trusses *necessary to complete the project*, not merely trusses in conformity with the plans. As long as the notices of correction were outstanding, the project could not be completed. If the notices of correction were traceable to a flaw in the architect's design, arguably Precision would be entitled to extra compensation for the repairs; nevertheless, the repairs constituted "substantial work necessary to the completion of the contract . . . ." (*Nevada County Lumber Co. v. Janiss*, *supra*, 25 Cal.App.2d at p. 582.)

Second, as discussed in footnote 2, *ante*, uncontradicted evidence showed that Inland, not the architect, designed the trusses. The architect was "responsib[le]" for the design, in the sense that he had to approve it and had to make sure it would work with the rest of the building, but the actual design work was done by Inland. While the written contract was ambiguous with respect to whether Precision was required to design the trusses, the other evidence demonstrates that it was. Precision contracted with Inland for

19

the trusses.  Inland's only contract was with Precision.  Moreover, Inland invoiced Precision.  In other words, Inland was Precision's subcontractor.  This course of dealing demonstrates that Precision's contract required it to provide design services.

In the trial court, Precision purported to dispute the fact that Inland was its subcontractor.  The evidence that it cited, however, failed to raise any triable issue.  For example, it cited Mears's testimony that the construction lender paid Inland directly.  As he explained, however, this was done "to ensure that the material suppliers were paid" — i.e., so Inland could not file a mechanic's lien claim.  Presumably, these sums came out of the amounts due to Precision.

It also cited the evidence that the general contractor inspected Precision's work and found no deficiencies; both Mears and the general contractor testified that, at that point, Precision had completed its scope of work.  But because the scope of work was established by the relevant contracts, this was merely the factually unsupported legal opinion of two lay witnesses.  Thus, even in the absence of an objection, it was *not* substantial evidence that the repair of the trusses was *not* within Precision's scope of work.  (See *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1110; *Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1191-1192.)

If, when Precision recorded its mechanic's lien claim, it did not know that it had any work left to do, it may seem unfair to hold that it recorded its claim prematurely.  However, we have not found any case law suggesting that a claimant's subjective knowledge or belief as to whether it has ceased to provide work is relevant.  In any event,

20

it did know by then that there was some kind of problem with the trusses. (See fn. 3, *ante*.) Moreover, nothing in the Mechanic's Lien Law prohibited it from recording its claim again after the repairs were performed.

We conclude that the repair of the trusses was part of Precision's "work." It does not matter whether Precision actually carried out the repairs itself or merely "helped coordinate" them. Hence, the trial court correctly granted summary judgment against Precision.

V

FAILURE TO REITERATE THE RULING ON

THE MOTION FOR SUMMARY ADJUDICATION IN THE JUDGMENT

Precision contends that the judgment should have expressly included the trial court's ruling summarily adjudicating the Luzuriagas' unlicensed contractor defense.

It cites Code of Civil Procedure section 437c, subdivision (k), which, as relevant here, provides: "[A] final judgment shall not be entered on a motion for summary judgment before the termination of the action, but the final judgment shall, in addition to any matters determined in the action, award judgment as established by the summary proceeding provided for in this section." This applies equally to motions for summary adjudication. (Code Civ. Proc., § 437c, subd. (f)(2).)

On its face, this requires only that the final judgment "award judgment as established" by the motion for summary adjudication. It does not require the final judgment to recite every individual legal or factual matter established by the motion.

21

Here, the summary adjudication established that one of the defenses the Luzuriagas were asserting lacked merit. It did not establish that either side was entitled to any particular judgment. Thus, there was no need for the judgment to recapitulate the summary adjudication.

Separately and alternatively, Precision has not shown that it has been prejudiced by the asserted error. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 939.) The record will show what the record will show. If somehow the fact that the motion for summary adjudication was granted becomes relevant, Precision can establish that without needing to have it stated in the judgment.

In Luzuriaga's view, Precision wants the ruling on the unlicensed contractor defense set forth in the judgment so it can use it against Ms. Luzuriaga in the ongoing litigation on her cross-complaint. The judgment we are reviewing, however, is not final as to Ms. Luzuriaga, precisely because the action as between her and Precision is still rolling forward. For that reason, she is not a party to this appeal. (See *Justus v. Atchison* (1977) 19 Cal.3d 564, 568, overruled on unrelated grounds in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171.) For the same reason, the judgment cannot operate as collateral estoppel against her. (See generally *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797.)

# VI

## APPORTIONMENT OF COSTS

Precision contends that the trial court erred by failing to apportion its award of costs as between Precision's complaint and Ms. Luzuriaga's cross-complaint.

A. *Additional Factual and Procedural Background.*

After judgment was entered in their favor, the Luzuriagas filed a verified memorandum of costs.

Precision filed a motion to tax costs. It argued, among other things, that some of the claimed costs related, in whole or in part, to Ms. Luzuriaga's cross-complaint. The motion was supported by a declaration of one of Precision's attorneys. He itemized the depositions taken, and he testified, with some specificity, that they related to the cross-complaint.

In opposition to the motion, one of the Luzuriagas' attorneys also submitted a declaration. He itemized the filing and motion fees incurred and explained how they related to Precision's complaint rather than to Ms. Luzuriaga's cross-complaint. He testified — like Precision's attorney, with some specificity — that the depositions related to the complaint. Finally, he itemized the service of process costs incurred and testified that they, too, related to the complaint rather than the cross-complaint.

After hearing argument, the trial court taxed the costs of one deposition and of Ms. Luzuriaga's travel. Otherwise, it denied the motion.

B. *Discussion.*

"[A] prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) Allowable costs include filing and motion fees, deposition costs, and service of process fees. (Code Civ. Proc., § 1033.5, subds. (a)(1), (a)(3), (a)(4).) However, to be allowable, costs must "be reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (*Id.*, subd. (c)(2).)

On a motion to tax costs, the prevailing party has the burden of proof; however, "if the items appear to be proper charges, the verified memorandum is prima facie evidence that the costs, expenses, and services therein listed were necessarily incurred . . . [citations], and the burden of showing that an item is unreasonable is upon the [losing party]. [Citations.]" (*Decoto School Dist. of Alameda County v. M. & S. Tile Co.* (1964) 225 Cal.App.2d 310, 316-317.)

We review a ruling on a motion to tax costs under the abuse of discretion standard. (*LAOSD Asbestos Cases* (2018) 25 Cal.App.5th 1116, 1123.) "Under this standard, we consider the court's legal conclusions de novo, and assess its factual findings for substantial evidence. [Citation.] We will not reverse the court's application of the law to the facts unless it is 'arbitrary and capricious.' [Citation.]" (*In re Butler* (2018) 4 Cal.5th 728, 738-739.)

We assume, for the sake of argument, that the trial court could award costs only if they were reasonably necessary for the litigation of Precision's complaint, as opposed to

Ms. Luzuriaga's cross-complaint. Even if so, Precision fails to show that the trial court broke this rule. It asserts: "The subject matter of the depositions concerned both the mechanic's lien, and the construction defect allegations of [the] Cross-Complaint." The cited portion of the record, however, fails to support this; in fact, the citation is to a completely irrelevant document.

Presumably the citation is intended to be to the declaration of Precision's counsel, in which he stated: "All of [the depositions] were noticed and taken in relation to the cross-complaint." Counsel for the Luzuriagas, however, testified, to the contrary, that "[t]he subject matter[s] of all depositions . . . are all part of [Precision's complaint] and related to my clients' affirmative defenses of set-off and unclean hands." This presented a classic factual issue for the trial court to resolve. On this record, no matter which way it resolved it, its decision would be supported by substantial evidence. Certainly Precision's briefing fails to show otherwise.

Finally, Precision introduced no evidence that the claimed filing fees and service of process fees did not relate to Precision's complaint. For this reason alone, the trial court properly refused to apportion these costs.

VII

LUZURIAGA'S CROSS-APPEAL

In the cross-appeal, Luzuriaga contends that the trial court erred by (1) denying his motion to compel production of documents  and (2) summarily adjudicating his

25

unlicensed contractor defense.  Because we are affirming the judgment, these contentions are moot.

VIII

DISPOSITION

The judgment is affirmed.  In the interest of justice, each side shall bear its own costs.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

McKINSTER
J.

SLOUGH
J.

26